**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

August 31, 2023

**By ECF**

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

RE:     *United States v. Khalid Melvin*, 22 CR 267 (AMD)

Dear Judge Donnelly:

A person might reasonably wonder why a man would carry a pistol with him
while he walked his dog at 9:00 a.m. on a Wednesday morning. The unfortunate
answer to this question is that Mr. Melvin (categorized as a level 3 sex offender[1]
following a conviction for a crime committed when he was 14 years old) has, for
years, faced constant threats of violence while in and around his Brownsville
apartment. Gang members regularly tell him to leave the neighborhood or face
death. Over the years, Mr. Melvin and his wife have attempted to report the more
concerning threats to the police but responding officers have never taken their
complaints seriously. Eventually they gave up on receiving police assistance.

In response to these threats, Mr. Melvin acquired a gun for protection. He
often carried the firearm when leaving his home. On the morning of December 1,
2021, Mr. Melvin was walking his dog a few blocks from his home. NYPD officers,
responding to a call from someone who said he saw a gun in Mr. Melvin's
waistband, stopped Mr. Melvin and recovered a pistol. Initially prosecuted in Kings

---

[1]     Level 3 is the highest risk level under New York law. Those, like Mr. Melvin, categorized as
level 3 have their address and photograph posted on the internet for public view. N.Y. Correct. Law §
168-q.

County courts, the case was eventually pursued in this Court where Mr. Melvin pleaded guilty to possession of a firearm after being convicted of a felony.

Mr. Melvin agrees that the guideline range found in the presentence investigation report ("PSR") is accurate: a final offense level of 12, which corresponds to a recommended range of imprisonment of 27 to 33 months in criminal history category V.[2] Considering Mr. Melvin's history and characteristics (including a deeply traumatic childhood and his wife's unusual dependence on his financial and emotional support) and the nature of the offense, a sentence of time served followed by a term of supervised release is appropriate in this case.

## PSR

Mr. Melvin makes the following clarifications to the presentence investigation report ("PSR"). None affect the guideline calculation.

The arrest and conviction noted in PSR ¶¶ 24 and 41 involved Mr. Melvin and his wife's infant daughter, who was injured in a car accident. Though she was seriously injured, Mr. Melvin did not immediately take her to the hospital, only bringing her to the emergency room after she became unresponsive. The injuries suffered by Mr. Melvin's daughter were catastrophic and likely contributed to her death 20 years later (presumably from COVID). Even today, Mr. Melvin has difficulty discussing his actions which may have contributed to his daughter's disability and recent death.  His depression was the major reason he asked pretrial services for mental health services in February of 2023.[3]

The arrest and conviction noted at PSR ¶ 26 involved Mr. Melvin trying to recover money owed to him for work he performed. Mr. Melvin went to the person's home to demand payment and a fight ensued. The victim of the attempted burglary was a man, not a woman. *Contra* PSR ¶ 26. Mr. Melvin did not have a firearm during this incident. He was arrested the same day of the incident and no gun was recovered.

## 18 U.S.C. § 3553(a)

Mr. Melvin asks the Court to consider the factors in 18 U.S.C. § 3553(a) to arrive at a fair and reasonable sentence. Section 3553(a) requires a sentence that is "sufficient, but not greater than necessary" to satisfy specific sentencing goals, including just punishment, deterrence of future criminal conduct, correctional

---

[2]    In the plea agreement, the parties anticipated a lower criminal history category and a guideline range of 15 to 21 months. Mr. Melvin stipulated to that guideline calculation and range of imprisonment and the government agreed to recommend a sentence within that range.

[3]    *See* undocketed pretrial services memorandum dated Feb. 6, 2023.

treatment, and the prevention of unwarranted sentencing disparities. *See* §
3553(a)(2). In determining the appropriate sentence, the Court must weigh several
factors, including Mr. Melvin's personal history and characteristics, the unique
nature and circumstances of the offense, and any mitigating factors that may exist.
*See, e.g., United States v. Hernandez*, 604 F.3d 48, 55 (2d Cir. 2010) (vacating
sentence based on district court's failure to consider "mitigating evidence" under §
3553(a)).

The Supreme Court has repeatedly affirmed a federal judge's ability to grant
a variance from the advisory guideline range based on the § 3553(a) factors. *See,
e.g., Beckles v. United States*, 137 S. Ct. 886, 892 (2017). The Supreme Court has
also made clear that granting a variance does not require a showing of
extraordinary or special circumstances. To the contrary, "courts are entitled to vary
from the . . . guidelines in a mine run case where there are no 'particular
circumstances' that would otherwise justify a variance from the guidelines'
sentencing range." *Spears v. United States*, 555 U.S. 261, 267 (2009) (internal
quotation omitted). This case however does present significant and unique
mitigating factors that argue for a sentence below the advisory guideline range.
Among them are Mr. Melvin's traumatic background and the unusual dependence
of his wife on him for financial and emotional support.

### Nature and circumstances of the offense

Thirty years ago, when he was 14 years old, Mr. Melvin was convicted of
rape. As a result of this conviction, he was categorized as a level 3 sex offender.
Consequently, his name, photo, address, and the nature of the conviction is publicly
available on New York's sex offender registry website. Mr. Melvin and his wife have
lived at their current address for more than 15 years. During that time, Mr.
Melvin's status as a sex offender has become well known in the neighborhood. For
years, he has been subject to harassment and threats because of his status. Some of
those who have threatened Mr. Melvin are gang members, who have told him they
will kill him if they see him on the street. Because of these threats, Mr. Melvin
illegally obtained a firearm and often carried it when outside his home, especially
when he would be walking in his neighborhood.

On the morning of December 1, 2021, Mr. Melvin was walking his dog a few
blocks from his apartment. He had the pistol concealed in his waistband. According
to documents produced as discovery, a person called 911 to report seeing the gun in
Mr. Melvin's waistband.[4] NYPD officers arrived soon after, stopped and searched
Mr. Melvin and then arrested him after finding the firearm.

---

[4]     Mr. Melvin took pains to conceal the firearm whenever he carried it and doubts that anyone
could have seen it before his arrest on December 1, 2021. He suspects that the caller was just
another person bent on harassing him because of his sex offender status. In any case, there is no

Mr. Melvin was aware that his possession of the gun was illegal. He possessed it, however, only for personal protection. He made the decision to do so based on the threats he had received from dangerous people living in his neighborhood. While his motivation obviously is not a defense to the charge, it explains his choice to arm himself. He did not do so to further any other criminal scheme, but only because he thought he was in danger.

**History and characteristics of the defendant**

Mr. Melvin was born in Germany in 1978. His father was stationed there with the American military at the time. His parents separated when Mr. Melvin was still an infant and he moved with his mother to Brooklyn. When he was 8 years old, he walked in on his mother, drenched in her own blood, following a suicide attempt. Mr. Melvin and his half-brother were then placed in the custody of ACS and resided in several group homes over the next 2 years. Because he was younger and smaller than most other residents of these homes, he was the subject of physical and sexual abuse by residents and employees. Even today, Mr. Melvin has difficulty discussing these years, mostly saying that everyone who ran those homes should be prosecuted.

Though his conviction at age 14 ended his formal education, Mr. Melvin was able to earn a GED in 2003. For the last 5 years, he has had steady work as a home health aide, bringing home about $3,000 a month. Prior to their daughter's death in 2022, Mr. Melvin's wife also worked full-time as a home health aide. However, she has been unable to work much since the death of their daughter because of depression. Thus, the payment of necessary household expenses, such as rent and utilities, is almost completely dependent on Mr. Melvin's income.

Mr. Melvin was arrested at his home on June 16, 2022 after the instant indictment was filed.[5] He appeared before Magistrate Judge Scanlon later that day and was released on a bond with stringent conditions, including electronically monitored home detention. Though this condition interfered with Mr. Melvin's employment (by preventing him from running errands for his clients), he largely complied with the restrictions. Mr. Melvin remained on home detention for more than 7 months; the condition was modified to a curfew on February 2, 2023. When his pretrial services officer called Mr. Melvin to explain the curfew to him, Mr. Melvin confided that he had been struggling with depression and asked for help. Pretrial requested and the Court granted the addition of a mental health treatment

---

question but that the NYPD received a call from an identified complainant and that the stop and search of Mr. Melvin was based on reasonable suspicion.

[5]    As noted above, NYPD officers arrested Mr. Melvin on December 1, 2021. He was then prosecuted in Kings County Criminal Court for several charges related to possession of a weapon. He posted bail in that case relatively soon after he was arraigned on the criminal complaint. The local case was dismissed after this federal prosecution was initiated.

condition to his terms of release. Though this may seem like a small issue, it was a milestone for Mr. Melvin—at age 45, it was the first time he recognized his need for mental health assistance and the first time he asked for it.

## Conclusion

Mr. Melvin acknowledges the seriousness of his criminal conduct. However, his motivation to possess the firearm was to protect himself—he was legitimately fearful. Considering the circumstances of the offense, Mr. Melvin's traumatic history, and the hardship his wife will suffer if he is imprisoned, a sentence of time served would serve the interests of justice. A term of supervised release with a condition of continued mental health treatment will serve the interests of society (and Mr. Melvin) more than a prison term would.

Thank you for your attention to this matter.

Respectfully submitted,

/s/

Michael K. Schneider, Esq.


cc:    Clerk of the Court (by ECF)
       Mr. Joshua Dugan, Assistant U.S. Attorney (by ECF and email)
       Mr. Steven S. Gutman, U.S. Probation Officer (by email)
       Mr. Khalid Melvin (by hand)